UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

Le Maitre USA, LLC, a Nevada corporation,

    Plaintiff

v.

Humber-Thames Marketing Ltd. dba Minerva, a foreign corporation,

    Defendant

Case No.: 2:25-cv-00692-JAD-MDC

**Order Granting Motion to Dismiss for Lack of Personal Jurisdiction**

[ECF No. 3]

    This suit arises from the cyber-security breach of the email account of Le Maitre Ltd. and Le Maitre USA, LLC's accountant.[1] Before the breach, the manager of the Le Maitre entities had contracted with UK-based information-technology company Humber-Thames Marketing dba Minerva to assist with its worldwide network-security and data-security needs.[2] Le Maitre USA theorizes that Minerva failed to protect its systems and sues Minerva in Nevada for breach of contract, breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, and negligence.[3] Minerva moves to dismiss for lack of personal jurisdiction, contending that it's not "at home in Nevada" and that it never directed any purposeful activities towards this state.[4] Because I find that Le Maitre USA failed to meet its burden of showing that Minerva purposefully availed itself of the privileges of conducting business in Nevada, I grant the motion to dismiss for want of personal jurisdiction and close this case.

---

[1] ECF No. 1-1; ECF No. 7 at 3.
[2] *Id.* at 11, ¶ 3; ECF No. 3-1 at 2.
[3] ECF No. 1-1.
[4] ECF No. 3 at 5.

**Background**

Nevada-based Le Maitre USA is the American counterpart to Le Maitre Ltd., based in England.[5] Karen Cornacchia is the primary manager for both companies.[6] When the Le Maitre companies needed the services of a new IT company, Cornacchia contacted Minerva's managing director, John Chadwick, with whom she shared a personal connection.[7] Minerva provides centralized IT support for a global network that is both physically and administratively located in the UK.[8] Cornacchia and Chadwick verbally agreed that Minerva would implement new server infrastructure, with full administrative control over Le Maitre UK's worldwide systems that included Le Maitre USA.[9] Le Maitre USA and Le Maitre UK share the same systems and servers, but Le Maitre USA has physical equipment in Las Vegas that maintains a private connection between it and Le Maitre UK.[10] According to Cornacchia, Le Maitre USA employees have their own local user accounts in Nevada, and she hired Minerva to help service seven of them.[11]

---

[5] ECF No. 7 at 2; 11, ¶ 2.

[6] *Id.* at 11, ¶ 4.

[7] ECF No. 3-1 at 2 (email from Cornacchia to Chadwick).

[8] ECF No. 8 at 3.

[9] ECF No. 7 at 11–12, ¶¶ 3–5. While Cornacchia declares that she hired Minerva "[o]n behalf of Le Maitre USA and Le Maitre UK," *Id.* at ¶ 3, Chadwick avers that the contract was with Le Maitre UK only. ECF No. 3 at 2; ECF No. 8-1 at ¶ 4. This court must resolve this conflict in favor of Le Maitre. *See Schwarzenegger v. Fred Martin Motor Co.,* 374 F.3d 797, 800 (9th Cir. 2004) (holding that when deciding personal jurisdiction, "[c]onflicts contained in affidavits must be resolved in the plaintiff's favor.").

[10] ECF No. 7 at 2.

[11] *Id.* at 11, ¶ 4, 12.

Shortly after the Le Maitre companies ended their relationship with Minerva, the email account of the companies' accountant was hacked.[12] Le Maitre USA asserts that the new IT company it hired after Minerva conducted an investigation and determined that a cyber-security breach occurred due to Minerva's failure to properly set up company-wide multi-factor authentication.[13] It alleges not only that this compromised all Le Maitre email data, but that the breach also allowed a Nigerian hacker to access the personal information of a Le Maitre USA customer.[14] With that information, the hacker successfully stole $40,000 that was meant for Le Maitre USA's bank account.[15] Le Maitre USA theorizes that if Minerva had installed multi-factor authentication, the hackers would not have been able to gain access to the account.[16] Relying on a comprehensive security assessment and audit of its system, Le Maitre USA alleges that Minerva failed to adequately provide the services promised to it.[17]

Le Maitre USA filed this suit against Minerva in Nevada, alleging that personal jurisdiction exists because Minerva directed its actions at this state and availed itself of its laws by working with a Nevada company.[18] Minerva moves to dismiss for lack of personal jurisdiction. It argues that Minerva contracted with Le Maitre UK only and that the cybersecurity incident did not occur in Nevada or involve Nevada-based actors, systems, or operations.[19]

---

[12] *Id.* at 3.
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] ECF No. 1-1 at ¶ 22.
[17] *Id.* at ¶¶ 22–26, 31.
[18] ECF No. 1-1 at 3.
[19] ECF No. 3 at 6.

3

**Discussion**

**I.    This court can exercise personal jurisdiction over an out-of-state defendant only if the defendant has a constitutionally sufficient connection to Nevada.**

The Fourteenth Amendment limits a forum state's power "to bind a nonresident defendant to a judgment of its courts."[20] So a federal district court may only exercise jurisdiction over a nonresident defendant with sufficient "minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"[21] To determine its jurisdictional reach, a federal court must apply the law of the state in which it sits.[22] Because Nevada's long-arm statute reaches the constitutional zenith,[23] the question is whether jurisdiction must "comport[] with the limits imposed by federal due process."[24] Federal Rule of Civil Procedure 12(b)(2) authorizes a court to dismiss a complaint for lack of personal jurisdiction.[25] A court may only exercise jurisdiction over a nonresident defendant only if it has sufficient "minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"[26]

---

[20] *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980)).

[21] *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

[22] *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014) (citing Fed. R. Civ. P. 4(k)(1)(A)).

[23] Nev. Rev. Stat. § 14.065.

[24] *Walden*, 571 U.S. at 283 (quoting *Daimler AG*, 571 U.S. at 125).

[25] Fed. R. Civ. P. 12(b)(2).

[26] *Int'l Shoe Co.*, 326 U.S. at 316 (quoting *Milliken*, 311 U.S. at 463).

## II.	Personal jurisdiction can be general or specific.

The law recognizes two categories of personal jurisdiction. The least common of these categories is "general jurisdiction," which exists when the defendant has "continuous and systematic" contacts with the forum state—contacts so pervasive that they "approximate" the defendant's "physical presence" in the forum state.[27] Le Maitre USA does not argue that Minerva has submitted itself to the general jurisdiction of this court, and nothing in this record suggests that Minerva has the continuous and systematic contacts with Nevada necessary to make such a finding. Indeed, Le Maitre USA offers nothing to refute Minerva's assertions that it is "at home" in the United Kingdom because Minerva is neither incorporated nor headquartered in Nevada.[28]

The more commonly occurring variety of personal jurisdiction for non-forum defendants is "specific jurisdiction," which "focuses on the relationship among the defendant, the forum, and the litigation."[29] For specific jurisdiction to attach, "[t]he plaintiff cannot be the only link between the defendant and the forum,"[30] and "[t]he unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum [s]tate" either.[31] The Ninth Circuit applies a three-prong test to determine whether the court may exercise specific jurisdiction over an out-of-state defendant: (1) the defendant "must have performed some act or consummated some transaction with the forum by which it

---

[27] *Schwarzenegger*, 374 F.3d at 801.

[28] ECF No. 3 at 4.

[29] *Walden*, 571 U.S. at 283–84 (quoting *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 775 (1984)) (internal quotation marks omitted).

[30] *Id.* at 285 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985)).

[31] *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).

purposefully availed itself of the privilege of conducting business" in the forum state; (2) the plaintiff's claims "must arise out of or result from [those] forum-related activities; and (3) the exercise of jurisdiction must be reasonable."[32]

The plaintiff bears the burden of satisfying the first two prongs.[33] In deciding whether a plaintiff has met that burden, the court must accept as true the uncontroverted allegations in its complaint, but a plaintiff cannot rely on "bare allegations" alone.[34] The court also may review affidavits or declarations submitted by either side,[35] and "conflicts between the parties over statements contained in affidavits must be resolved in the plaintiff's favor."[36] If the plaintiff satisfies the first two prongs, then the defendant must show a "compelling case that the exercise of jurisdiction would not be reasonable" in order to escape the exercise of jurisdiction.[37]

### III. This court lacks jurisdiction over Minerva because this foreign company did not purposefully avail itself of the benefits of doing business in Nevada.

The term "purposeful availment" in the first prong of the specific-jurisdiction test describes two distinct analyses, depending on the type of claim: purposeful availment and purposeful direction.[38] Courts generally apply the purposeful-availment test to suits sounding in contract or negligence,[39] and the purposeful-direction test to intentional torts.[40] Although Le

---

[32] *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1019 (9th Cir. 2002); *see also Schwarzenegger*, 374 F.3d at 802.

[33] *Schwarzenegger*, 374 F.3d at 802 (9th Cir. 2004).

[34] *Id.* (quoting *Amba Mktg. Sys., Inc. v. Jobar Int'l, Inc.*, 551 F.2d 784, 787 (9th Cir. 1977)).

[35] *Id.*

[36] *Id.* at 800 (cleaned up).

[37] *Id.* at 802 (cleaned up).

[38] *Id.*

[39] *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 460 (9th Cir. 2007).

[40] *Freestream Aircraft (Bermuda) Ltd. v. Aero Law Grp.*, 905 F.3d 597, 606 (9th Cir. 2018).

Maitre's lawsuit sounds both in contract and in tort, the bulk of its claims against Minerva are contract and negligence based, so the purposeful-availment test applies here.[41]

Le Maitre contends that Minerva satisfies that test. It relies on the Nevada district court case of *Rigdon v. Bluff City Transfer & Storage Co.*[42] for the proposition that a defendant purposefully avails itself of a forum merely by entering a contract knowing that some performance will occur there.[43] But the *Rigdon* passage that Le Maitre cites merely addressed Nevada's long-arm statute, not the federal due-process test for purposeful availment.[44] When that court turned to purposeful availment, it looked to *Burger King v. Rudzewicz,* in which the Supreme Court rejected the notion that a mere contract, standing alone, automatically establishes jurisdiction.[45] Rather, it demanded a "highly realistic" appraisal of the defendant's contacts, considering four central factors: (1) the parties' prior negotiations, (2) the contemplated future consequences of the agreement, (3) the terms of the contract itself, and (4) the parties' actual course of dealing.[46]

In *Burger King*, Rudzewicz did not stumble into a single transaction with a Florida business.[47] He reached out from Michigan to negotiate a 20-year franchise agreement with

---

[41] Both parties use "direction" interchangeably with availment but do not apply the *Calder* effects test that is used for this analysis. And even though Minerva argues that Le Maitre's breach-of-the-implied-covenant-of-good-faith-and-fair-dealing claim sounds in tort, Le Maitre does not argue whether it's under tort or contract. But because Le Maitre alleges underlying conduct based on a contractual relationship, I find that the claims sound in contract.

[42] *Rigdon v. Bluff City Transfer & Storage Co.*, 649 F. Supp. 263 (D. Nev. 1986).

[43] ECF No. 7 at 7–8.

[44] *Rigdon*, 649 F. Supp. at 266–67.

[45] *Id.* at 267–68; *Burger King,* 471 U.S. at 478.

[46] *Burger King*, 471 U.S. at 479.

[47] *Id.* at 466–67.

7

Burger King's headquarters in Miami.[48] In doing so, he tied himself to an ongoing and exacting regulatory relationship with that Florida office.[49] The contract required regular payments in Miami, placed the franchise under the Miami office's supervision, and expressly provided that Florida law would govern.[50] The High Court found that those collective considerations meant that Florida's exercise of jurisdiction did not offend due process.[51]

      The Ninth Circuit applied the *Burger King* factors in *Davis v. Cranfield Aerospace Solutions, Ltd.* to find that Idaho lacked specific jurisdiction over a UK aerospace firm.[52] Tamarack, an Idaho company, had contracted with Cranfield to obtain aviation certifications.[53] After a fatal crash in Indiana, the victims' representatives sought to hale Cranfield into an Idaho court based on that contract.[54] Cranfield's role was not trivial: it gave technical advice to Tamarack's engineers, approved test schedules, validated reports, and even sent employees to Idaho twice for project meetings.[55] It also held regulatory certifications in its own name—certifications that Tamarack couldn't use for its operations without Cranfield's approval.[56]

      Yet the court deemed those contacts "too attenuated" to show purposeful availment because Cranfield never established a substantial presence in Idaho.[57] It had no offices,

---

[48] *Id.* at 480.

[49] *Id.*

[50] *Id.* at 480–81.

[51] *Id.* at 487.

[52] *Davis v. Cranfield Aerospace Sols., Ltd.*, 71 F.4th 1154 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 826 (2024).

[53] *Id.* at 1160.

[54] *Id.* at 1160–61.

[55] *Id.* at 1164–65.

[56] *Id.*

[57] *Id.* at 1166.

facilities, employees, or agents in the United States, and it never advertised or marketed there.[58] Tamarack had initiated contact with Cranfield by phone and email, all negotiations occurred either remotely or in England, and Cranfield informed Tamarack that its employees would remain in the UK.[59] The contract itself invoked New York law and designated New York as the forum.[60] The panel found that none of those features suggested that Cranfield had deliberately invoked the benefits and protections of Idaho.

      Nor did the parties' course of dealing sway the *Davis* court to find jurisdiction. Cranfield employees exchanged phone calls, emails, and other correspondence with Idaho personnel about Tamarack's aviation system.[61] It also provided technical advice and procedures for European and U.S. certification processes.[62] But all of that work was performed in England.[63] Because Cranfield's technical work was performed abroad, its remote assistance to Tamarack "d[id] not, without more, establish purposeful availment," the *Davis* court reasoned.[64]

      Le Maitre USA contends that Minerva established a substantial relationship with Nevada because it negotiated with Cornacchia about its services to both companies, was hired to provide security for servers shared by both companies and install multi-factor authentications for its employees including seven in Las Vegas, discussed after-hours support for Las Vegas employees, assisted Le Maitre USA with FedEx software, accessed Le Maitre USA employee

---

[58] *Id.* at 1163.
[59] *Id.* at 1164.
[60] *Id.*
[61] *Id.* at 1164–65.
[62] *Id.*
[63] *Id.*
[64] *Id.* at 1165.

email accounts, and provided remote support to North Las Vegas employees.[65] But this case is more like *Davis* than *Burger King*. Minerva has no offices, facilities, employees, or agents in the United States.[66] Minerva does not advertise or market services in Nevada, and it was the Le Maitre entities—not Minerva—who initiated the relationship.[67] The servers that hosted Le Maitre's global network are physically located in the UK,[68] and Minerva delivered its services from there.[69]

The FedEx software issue that Le Maitre USA highlights was a US-based problem: although the program sat on the UK server, it was only used by Le Maitre USA employees.[70] While Le Maitre USA presents evidence that Minerva acknowledged the issue, the record also shows that both parties agreed that a Le Maitre employee, not Minerva, would approach FedEx to remove the dependency on the UK and its servers.[71] The record also shows that the time difference between Las Vegas and the UK made "support from the [UK] impractical,"[72] so the parties agreed that a local IT provider would be engaged to supply "[after] hours support for Las Vegas."[73] Those contacts are even less anchored to the forum than the services Cranfield provided to Tamarack in *Davis* because they reveal that Minerva was not providing specialized services to the US. And like in *Davis*, the contract terms also point away from Nevada:

---

[65] ECF No. 7 at 8.
[66] ECF No. 8-1 at 2.
[67] ECF No. 3-1 at 2 (email from Cornacchia to Chadwick seeking IT support).
[68] ECF No. 8 at 7.
[69] *Id.*
[70] ECF No. 7-1 at 4 (Le Maitre and Minerva meeting minutes).
[71] *Id.*
[72] *Id.*
[73] *Id.*

Cranfield's agreement invoked New York law, while Minerva's invoices invoked UK law.[74] And Minerva's invoices were also sent to Le Maitre UK's office.[75]

Minerva's only tie to Nevada, other than the alleged contract, is that Le Maitre USA happens to have employees here. That connection remains too attenuated to approximate the Florida-anchored franchise in *Burger King*. Minerva did not cultivate the Nevada market, tailor services to Nevada, or anchor its performance in Nevada. Because Le Maitre USA has failed to establish that Minerva has purposefully availed itself to this forum, I need not, so do not, address the other prongs of the specific-jurisdiction test. So I grant Minerva's motion to dismiss, and I dismiss this suit without prejudice for want of personal jurisdiction.[76]

### Conclusion

IT IS THEREFORE ORDERED that Minerva's motion to dismiss for lack of personal jurisdiction **[ECF No. 3] is GRANTED**. Le Maitre's complaint is **DISMISSED** without prejudice. The Clerk of Court is directed to **CLOSE THIS CASE**.

_____
U.S. District Judge Jennifer A. Dorsey
September 11, 2025

---

[74] ECF No. 3-3 at 2. (Minerva's invoice sent to Le Maitre). Though Le Maitre contends in its response that it was unable to access the terms and conditions cited in Minerva's motion, ECF No. 7 at 9–10, this fact is not dispositive in my analysis, so I do not address it.

[75] *Id.*

[76] *Cox v. CoinMarketCap OPCO, LLC*, 112 F.4th 822, 836 (9th Cir. 2024) ("A dismissal for lack of personal jurisdiction does not adjudicate the merits and so should be without prejudice.").

11